256 S.E.2d 549 (1979)
STATE of West Virginia
v.
M. M.
No. 14201.
Supreme Court of Appeals of West Virginia.
June 25, 1979.
*551 Rickey, Chase, Chase & Hyre and Frederick E. Gardner, Moundsville, for plaintiff in error.
Chauncey H. Browning, Atty. Gen. and Joseph C. Cometti, Asst. Atty. Gen., Charleston, for defendant in error.
*550 McGRAW, Justice:
On January 6, 1978, the Circuit Court of Wetzel County transferred the case of sixteen year old M. M. to a criminal proceeding. The child appeals from the transfer order. See, W.Va.Code § 49-5-10 [1977]. One set of issues in this appeal concerns the trial court's admission of certain expert testimony. The other issue is whether the court was correct in concluding there were no reasonable prospects for rehabilitating the child. We reverse the judgment of the circuit court and remand the case for further proceedings.
On December 23, 1977, a person armed with a handgun robbed Dyer's Amoco station in New Martinsville. The robber was observed fleeing the scene in an automobile occupied by several persons. A description of the vehicle was broadcast on police radio. Later that evening the sheriff and a deputy observed and gave chase to an automobile fitting the suspect vehicle's description. During the pursuit shots were fired at the sheriff's car from the right side of the escaping vehicle. One round struck the driver's side windshield of the cruiser causing shattered glass to strike the face of the driver Deputy Carl Kernan. At one point during the chase the distance between the two vehicles narrowed, and the sheriff recognized the occupant of the right front seat as M. M. He was subsequently arrested, and by written petition filed in juvenile court, was charged with armed robbery and malicious assault. See, W.Va.Code §§ 61-2-12, 61-2-9.
The State filed a motion for the transfer of the case to criminal jurisdiction. The motion was heard on January 6, 1978. Following the hearing the court found the offenses allegedly committed by the juvenile were crimes of violence, and there were no reasonable prospects of rehabilitating the juvenile through the resources available to the court.[1] The court ordered the transfer.
Appellant asserts the trial court committed the following errors:
1. Erred in admitting, over objection of juvenile's counsel, the testimony of Norman Morris and Ronald D. Pearson, as experts on the subject of juvenile rehabilitation *552 in the juvenile institutions of this State.
2. Erred in finding there were no reasonable prospects of rehabilitating M. M. through the resources available to the court.
3. Erred in ordering the transfer of jurisdiction over M. M. to a criminal proceeding.
Initially we consider the issue of the admission of the expert testimony. During the transfer hearing the trial court permitted Sheriff Morris to express an opinion as an expert on certain matters regarding the prospects for rehabilitating the juvenile.
Counsel for the State questioned the sheriff regarding his knowledge of the Industrial School for Boys at Pruntytown and the Davis Center at Blackwater Falls. As the prosecutor was propounding a hypothetical question regarding prospects for rehabilitation the child's counsel objected on the ground the sheriff had not been qualified as an expert on the matter. Before ruling the court asked the sheriff four questions concerning his knowledge of the institution; then the objection was overruled, and the following exchange occurred:
The Court: ". . . do you feel Pruntytown would have a rehabilitative effect on someone who has committed a crime of violence such as armed robbery?"
Witness: [Sheriff] "No, sir."
The Court: "Did you see any type of rehabilitative program over [there] that you thought would be suitable for someone who has committed such a crime of violence or (sic) armed robbery or something of that nature?"
Witness: [Sheriff] "No, sir."
Was the sheriff an expert qualified to offer these opinions? To answer this we must assess his knowledge of Pruntytown's facilities for the rehabilitation of juveniles. He had taken several boys there and was "acquainted with" the institution. When asked if he knew "whether or not there are any rehabilitation facilities present at Pruntytown?", he replied, "Well, to my knowledge, at this institution, it's more of an honorary institution. There's no walls. There's no fences. Boys can escape if they want to. There's nothing to keep them from it." The sheriff had made one tour of Pruntytown with a staff member who offered some explanation of the institution and the programs. But, when asked if he was familiar with the institution and "what they do" at the institution, he could only answer, "I have been through it, yes." There is no other evidence of the sheriff's knowledge of the institution. Clearly his knowledge of these matters was severely limited.
The juvenile asserts that the court also erred by allowing Trooper Pearson to testify as an expert on the prospects for rehabilitation.
Counsel for the State questioned Pearson regarding his knowledge of the Davis Forestry Center and established the trooper "had been in contact with" and "observed" the Center; talked with some of its personnel; had an explanation "in general terms" of its operation; and had talked about the subject with other troopers. But, the trooper had not had a guided tour, had not had a specific explanation of the Center's facilities, had no formal training of any kind regarding the institution or its programs, and did not know the age range of juveniles residing there.
Based on this background, but without first seeking to have the witness qualified as an expert, counsel for the State attempted to propose a hypothetical question dealing with the child's prospects for rehabilitation at the Davis Center. The child's counsel objected that the trooper was not qualified to state an opinion.
As was the case during the questioning of the sheriff, the court interceded:
The Court: "Let's see. Now, just a minute. An expert in this State is someone that has more knowledge about the subject about which he is testifying than the ordinary lay person. I mean that's the Court's definition of an expert. Now, let's see."
The judge then questioned the trooper and established he had visited the Center twice *553 a year for nine years, had turned boys in, had a meal, and looked around the facility. He had on some occasions talked with some unnamed staff member and discussed the facility with residents. The following colloquy then occurred:
The Court: "Using all this knowledge you gained, from visits, from discussions with the men at the institution, from discussions with the boys that have been at the institution, do you have an opinion regarding the rehabilitative aspects of the institution?"
The witness: "Yes, sir, I do."
The Court: "Do you still wish to renew your objection?" [to M.M.'s counsel]
Counsel: "To your question? Not at this time."
The Court: "Now, go ahead, Mr. Bowser." [to counsel for the State]
Mr. Bowser: "The question I am now posing is based upon your association with the respondent in this case, [M.M.], personal observation of this individual, do you feel that he could benefit from the facilities you have observed and have gained personal knowledge of such as the Davis Center and Forestry Camp?"
The child's counsel objected on the grounds the witness was not qualified as an expert and lacked the necessary knowledge of the juvenile to state such an opinion. The objection was overruled. The witness answered in the negative.
In permitting Sheriff Morris and Trooper Pearson to offer opinions as experts on these matters the court asserted that an expert is someone who "has some peculiar qualification or more knowledge than jurors are ordinarily supposed to have." The State insists this standard is appropriate to judge the qualifications of the sheriff and Trooper Pearson. We disagree. This rule was most recently articulated by this Court in Cochran v. Appalachian Power Co., W.Va., 246 S.E.2d 624 (1978). Its origins can be traced to cases decided before the turn of this century. Perhaps the rule is best stated in the case of Ellison v. Wood & Bush Co., 153 W.Va. 506, 518, 170 S.E.2d 321, 329 (1969): "Opinion evidence dealing with value and damages to land is admissible if the witness has some peculiar qualification or more knowledge than jurors are ordinarily supposed to have." (emphasis supplied) The rule so stated and limited is acceptable. A careful examination of this line of cases reveals the rule's use has been limited to opinions on value, quantity or damages to the value of land. In most cases opinions offered under this rule have been those of the owner or a person intimately acquainted with the matter in question. The logical basis of the rule is that the owner of a thing is qualified to express an opinion on its value. The rule is not a rule of expert evidence, it is a rule dealing with the admission of non expert opinion as an exception to the general inadmissibility of such opinion. The rule relates to the specific competency of witnesses to testify to particular facts. See, Kay v. Glade Creek & R. R. Co., 47 W.Va. 467, 35 S.E. 973 (1900). In fact, the plain words of the rule itself indicate that its application is limited to situations where the witness is not an expert. The opinion of a witness who is not an expert may be given in evidence if he has some peculiar knowledge or more knowledge concerning the subject of the opinion than jurors are ordinarily expected to have (emphasis supplied). Syl. pt. 4, Overton v. Fields, 145 W.Va. 797, 117 S.E.2d 598 (1960); syl. pt. 7, Stenger v. Hope Natural Gas Company, 139 W.Va. 549, 80 S.E.2d 889 (1954); syl. pt. 8, Toppins v. Oshel, 141 W.Va. 152, 89 S.E.2d 359 (1955); syl. pt. 4, Lively v. Virginian Railway Company, 104 W.Va. 335, 140 S.E. 51 (1927); syl. pt. 8, Cochran v. Craig, 88 W.Va. 281, 106 S.E. 633 (1921). While this rule may be reasonable and appropriate within its proper limits it should not be used as a standard to qualify expert witnesses; such a use is erroneous and was never intended. Neither past usage nor the logic underlying the rule recommend its extension to situations such as the instant case. Here we deal with complex matters of human behavior; matters whose understanding involves true expertise, not mere specific competency. In *554 such matters a stricter standard is called for to determine whether a witness is qualified to state an opinion as an expert.
Before a witness can be qualified as an expert on the subject of juvenile rehabilitation, that witness must, through training, education or practical experience, possess significant skill and knowledge regarding the rehabilitation of juveniles. 31 Am. Jur.2d Expert and Opinion Evidence § 31 (1967); McKelvey Adm'x v. The Chesapeake & Ohio Ry. Co., 35 W.Va. 500, 14 S.E. 261 (1891); Snodgrass v. Weaver, 120 W.Va. 444, 199 S.E. 1 (1938); Redd v. Carnahan, 65 W.Va. 330, 64 S.E. 138 (1909); Sebrell v. Barrows, 36 W.Va. 212, 14 S.E. 996 (1892).
When judged by this standard neither Sheriff Morris nor Trooper Pearson qualify as experts in juvenile rehabilitation. The evidence shows that the sheriff and the trooper had a limited and superficial contact with the institutions about which they offered opinions. Neither possessed education, training or experience in the field of juvenile rehabilitation. Whether a witness is qualified to express an opinion is a matter which rests within the discretion of the trial court and its ruling on that point will not ordinarily be disturbed unless it clearly appears that its discretion has been abused. Syl. pt. 5, Overton v. Fields, 145 W.Va. 797, 117 S.E.2d 598 (1960); syl. pt. 7, Lewis v. Mosorjak, 143 W.Va. 648, 104 S.E.2d 294 (1958); syl. pt. 9, Toppins v. Oshel, 141 W.Va. 152, 89 S.E.2d 359 (1955); 32 C.J.S. Evidence §§ 449, 458b (1964). The court below clearly abused its discretion in holding the sheriff and the trooper were qualified as experts in the matters regarding which they testified. Moore, Kelly & Reddish, Inc. v. Shannondale, Inc., 152 W.Va. 549, 165 S.E.2d 113 (1968).
Even if the Sheriff and Trooper Pearson had been properly qualified as experts, their opinions would have been inadmissible because they were not founded on a sufficient knowledge of M. M.'s background. More particularly, both the sheriff and Pearson failed to exhibit sufficient personal knowledge of the child with regard to those factors set forth in the statute.[2] Moreover, there were not sufficient facts testified to by other witnesses upon which the opinions could have been based. [Expert] "testimony is founded either on personal knowledge of the facts or else is based on facts shown by the testimony of others." Sebrell, supra at 222, 14 S.E. at 999. The opinion of the sheriff and the trooper lacked a proper factual foundation.
M. M. contends the court erred by concluding the State produced clear and convincing proof there were no reasonable prospects for rehabilitating him.
The opinions of the sheriff and the trooper constituted a significant portion of the State's evidence on the issue of prospects for rehabilitation. After the exclusion of their opinions, the testimony and opinion of Ms. Craddock, the juvenile probation worker, are the only remaining evidence on this point.
Ms. Craddock's knowledge and testimony were clearly limited to Wetzel County.
Ms. Craddock: "My opinion is just based on the fact that I tried different alternatives to keep [M.] in the community in a home based here."
The Court: "Now, you are aware of the programs available to the court in this county, as the probation officer, do you feel that continued probation would benefit [M.L.M.]?" (emphasis supplied)
Ms. Craddock: "No, I don't."
The evidence offered by Ms. Craddock does not possess the weight necessary to satisfy the State's burden of proof. Standing uncontradicted and taken as true it proves only that the child could not be rehabilitated by continued probation in Wetzel County. This is insufficient to meet the State's burden of proof; insufficient because the evidence is confined to Wetzel County. But, even when so limited the probative value of the evidence is lessened *555 because of the minimal extent of Ms. Craddock's contact with the child. And, because the evidence fails to show what if any training and education she had in juvenile rehabilitation her qualifications to offer an expert opinion, even limited to Wetzel County, are suspect. Outside of those unnamed alternatives she tried in Wetzel County, she clearly lacked specific competency. She had never visited any state juvenile facility but had only secondhand knowledge gained through acquaintances and newspapers. Ms. Craddock's evidence standing alone and viewed in its most favorable light does not constitute the necessary clear and convincing proof there were no reasonable prospects for rehabilitating M. M. In fact, the State would fail in this regard even if the testimony of Sheriff Morris and Trooper Pearson were admissible.
The State is charged with producing clear and convincing proof there are no programs, facilities or institutions available to the court which would offer reasonable prospects for rehabilitating the juvenile. To prove this the evidence must show consideration has been given to every feasible alternative to which the court could possibly refer the juvenile. With regard to the availability of facilities the inquiry may not be arbitrarily limited to the county in which the proceedings occur, or even to this State. The evidence must also show the reasons the various alternatives considered offer no reasonable prospects to rehabilitate the juvenile. The burden of proving this negative proposition is without doubt difficult, but certainly not insurmountable. Conceivably the burden could be met by the testimony of a single expert witness familiar with the full range of treatment alternatives and thoroughly acquainted with the juvenile.
Judged against these standards, the State's case is not sufficient in several respects. First, the record contains no evidence showing consideration was given to any alternatives other than continued probation in Wetzel County, or confinement in Pruntytown or the Davis Center. There is no evidence showing all alternatives were considered. It may be that no program, facility or institution existed in January, 1978, which could offer any reasonable prospects to rehabilitate M. M.[3] But, even if this is so, the State's evidence failed to prove it. Second, the State failed to show why the rejected alternatives of continued probation and confinement at Davis Center or Pruntytown were not suitable for rehabilitating M. M.
Additionally, the State's burden on this issue was all the more difficult considering the minimal nature of the prior attempts at rehabilitation. As a result of a petit larceny charge M. M. was placed on probation on September 29, 1977. Over a period of two months the juvenile probation officer was in contact with him "several times." "He was to come in on Saturday mornings, and there were a few months when I was gone due to illness and death in my family." Since M. M. was placed on probation on September 29th and got into serious trouble less than three months later it is difficult to understand how Ms. Craddock could be absent for "a few months" and still have adequate time to offer guidance or treatment to him during the critical initial period of his probation. After he was placed on probation, his first appointment with the probation officer was October 10th. He showed up, she didn't. On October 14th he was expelled from school. Ms. Craddock testified that she tried "every other alternative" with him. Yet, the record contains no evidence of any plan of treatment, and fails to show what alternatives were tried and rejected. The evidence only shows probation with minimal supervision. *556 As the judge put it, "this court has extended probation to him." The choice of language expresses well the passive nature of the State's so-called attempts at rehabilitation. The court "extended" probation to M. M., a youth with a history of troubles with the law, apparently expecting that without active counseling or treatment he would rehabilitate himself; to no one's surprise he failed. Sadly, the bulk of Ms. Craddock's testimony detailed his failures, which in reality are the failures of our system of juvenile justice.
In State ex rel. E. D. v. Aldredge, W.Va., 245 S.E.2d 849, 852 (1978) we observed that under the 1977 law some significant attempt at rehabilitation must be made, and where no such effort has been made the State's burden of proving there are no reasonable prospects of rehabilitation becomes exceedingly difficult. The required attempts at rehabilitation must be more than the passive "extension of probation." There must be some attempt to assess the cause of the child's behavioral problems, alternative plans of treatment must be considered, and it must appear that reasonable attempts were made to implement a plan of treatment. If there was a feasible plan of treatment that was not pursued, the reasons for its absence must be shown. The record below contains no evidence any of these things were done or even considered.
For all of the foregoing reasons the State's case on the issue of prospects for rehabilitation was deficient. Accordingly, the court was clearly wrong in concluding the State's evidence clearly and convincingly proved there were no reasonable prospects for rehabilitating M. M. "Where the findings of fact and conclusions of law justifying an order transferring a juvenile proceeding to the criminal jurisdiction of the circuit court are clearly wrong or against the plain preponderance of the evidence, such findings of fact and conclusions of law must be reversed." State v. Bannister, W.Va., 250 S.E.2d 53 (1978).
The 1977 law requires the trial court to make findings of fact and conclusions of law and incorporate them in the transfer order. The following matters were denominated as findings of fact by the trial court:
The offenses allegedly committed by the juvenile are crimes of violence and he evidences conduct which, in the opinion of this Court, constitutes a substantial danger to the public.
The Court has no reasonable prospects of rehabilitating said juvenile through the resources available to the Court.
These are not findings of fact. They are conclusions of law. A finding of fact is a statement of a fact in evidence or a fact properly inferable therefrom. Conclusions of law arise from findings of fact based on evidence in the record; evidence that should relate directly to the factors required by statute to be considered; evidence that should constitute clear and convincing proof in support of the conclusions of law set forth.
Throughout the proceedings below, portions of the court's questioning revealed an emphasis on the violent nature of the crime. The court placed undue emphasis on the nature of the crime and failed to properly consider other factors the statute requires the court to consider. All persons who commit violent crimes are not alike in their prospects for rehabilitation. Some violent offenders can be rehabilitated, others can not be. Placing undue weight on the nature of the crime and excluding other factors assures that no distinction is made between these groups. W.Va.Code § 49-5-10 [1977] directs that in reference to the prospects for rehabilitation the court must consider the child's mental and physical condition, maturity, emotional attitude, home or family environment, school experience and the like. The record below lacks evidence on these factors. It may be the trial court had no evidence to consider on these points. Absent evidence of this type the court relied too heavily on the nature of the crime. The nature of the crime alone is not sufficient to warrant transfer of juvenile proceedings to criminal status. A. v. State, 137 Ga.App. 511, 224 S.E.2d 491 (1976).
The decision to try a juvenile as an adult has enormous and lifelong consequences for *557 the child and for society. The right to be treated as a juvenile is a valuable right. But, the right must be balanced against society's legitimate and ever-growing concern about rapidly rising levels of juvenile crime. It is a balance that is difficult to strike. Yet, in each case we must make a good faith attempt to strike the balance. No long term interest is served by a pro forma adherence to lofty legislative principles. Hearings without substance, moving mechanically to a preconceived result while reciting "magic statutory language" will always transfer those who can be rehabilitated as well as those who cannot be. Passive "attempts" at rehabilitation represented by the mere extension of probation without treatment will result only in self-fulfilling prophecies of failure.
For the foregoing reasons we reverse the trial court's judgment and remand the case for further proceedings consistent with this opinion.
Reversed and remanded.
NOTES
[1] W.Va.Code § 49-5-10(a) [1977] provides:

Upon motion of the prosecuting attorney, the recommendation of the referee or upon its own motion, the court may at the time specified in section nine of this article transfer to a criminal proceeding the case of a child who is alleged to have committed, on or after his sixteenth birthday, an offense which, if committed by an adult, would be a felony if there is clear and convincing proof that: (1) The offense allegedly committed by the child is one of violence or evidences conducted which constitutes a substantial danger to the public; and (2) there are no reasonable prospects for rehabilitating the child through resources available to the court under this article. With reference to such rehabilitation prospects the court shall consider the child's mental and physical condition, maturity, emotional attitude, home or family environment, school experience and the like. The burden of proof of such determination shall rest on the petitioner.
[2] W.Va.Code § 49-5-10(a): "With reference to such rehabilitation prospects the court shall consider the child's mental and physical condition, maturity, emotional attitude, home or family environment, school experience and the like."
[3] Counsel for juveniles have a duty to offer any evidence that tends to show there are reasonable prospects for rehabilitating the juvenile. Such a showing would necessarily render proof of the State's proposition quite difficult and would raise additional questions. Syl. pt. 3, State ex rel. C.A.H. v. Strickler, W.Va., 251 S.E.2d 222 (1979); See In re Welfare of J.E.C. v. State, 302 Minn. 387, 225 N.W.2d 245 (1975); State ex rel. Harris v. Calendine, W.Va., 233 S.E.2d 318 (1977); Wyatt v. Stickney, 325 F.Supp. 781 (M.D.Ala.1971).